NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-15

COMMONWEALTH

vs.

JOSIAH STEWARD.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The defendant, Josiah Steward, was charged with possession of a class A controlled substance with intent to distribute, G. L. c. 94C, § 32 (a), and possession of a class B controlled substance with intent to distribute, G. L. c. 94C, § 32A (a). He filed a motion to suppress physical evidence, namely several plastic baggies containing white-colored substances and $1,240 in currency. Following an evidentiary hearing, a judge of the District Court denied the motion. A single justice of the Supreme Judicial Court allowed the defendant to pursue an interlocutory appeal to this court. We reverse.

Background. "When reviewing a ruling on a motion to suppress, 'we adopt the motion judge's subsidiary findings of

fact absent clear error . . .'" (citation omitted).

Commonwealth v. Arias, 497 Mass. 425, 429 (2026).  To the extent the findings rely on video footage from a body-worn camera, "the judge's findings drawn from it are not entitled to deference, and we may review such evidence de novo."  Commonwealth v. Tremblay, 480 Mass. 645, 656 (2018).

On June 17, 2024, Yarmouth police detective Nicholas Ambrosini was on patrol in Yarmouth "looking for street-level narcotics-type interactions."  He was dressed in plain clothes, driving an unmarked police cruiser, and using a body-worn camera.  The detective testified that an unidentified source told him that there was a house in Yarmouth with drug activity.[1] He checked on the house a few times throughout the day and noticed a black Toyota pickup truck in the driveway.  Later that day, the detective saw the truck traveling on Station Avenue. He ran the license plate through the computer in his cruiser and discovered that the truck was uninspected.

The detective conducted a motor vehicle stop of the truck at 6:26 P.M.  Once the truck pulled to the side of the road, the detective approached the driver-side door and began talking to the driver.  The driver gave the detective his license and told

---

[1] We agree with the motion judge that there was a lack of evidence regarding the drug activity tip.  We similarly do not use the tip in our analysis.

2

the detective that the truck was registered to his mother. The detective then asked the driver to retrieve the registration. As the driver was searching for the registration, the detective said to the driver, "you're scaring the shit out of me, because you're shaking, and you're breathing like your heart is about to fall out of your chest." The driver responded that he had Parkinson's disease.

The detective saw the defendant, seated in the passenger seat. The detective testified that the defendant was looking straight ahead and tapping his right front pocket, in which the detective noticed a bulge.

The detective returned to his cruiser to check the driver's license. At this time, a second officer arrived at the scene. The detective told the arriving officer that the driver and the defendant were both "super fucking nervous" and that the officer should keep an eye on them. While the detective was in his cruiser, he noticed the defendant moving about in the truck. More specifically, he testified that he saw the defendant's "head moving from left to right, and his shoulders moving, as well as his whole body shifting up in the seat." The detective further testified that, based on those movements, he was afraid the defendant was reaching for or concealing a weapon.

The detective left his cruiser and approached the passenger side of the truck. When he reached the passenger door, he

3

opened it and saw that the defendant had a cell phone in his hand. The detective asked the defendant if he was playing on his phone, and the defendant replied "no." The detective then issued an exit order. The defendant complied, and the detective asked the defendant if he had any guns or knives on him. The detective pat frisked the defendant and felt two bulges in the defendant's pockets, which the detective later testified he immediately knew was currency. He briefly removed the currency from the defendant's right pocket and then placed it back in the pocket.

After returning the currency to the defendant's pocket, the detective placed the defendant in handcuffs and informed him that he was being detained but not under arrest. The detective removed the currency from the defendant's right pocket a second time and asked the defendant its value. The defendant replied that it was $500 and that he intended to put the money in the bank. When asked who he worked for, the defendant stated that he worked "under the table." The detective then asked the defendant for his name and where he was from, both of which the defendant provided. Following this line of questioning, the detective directed the defendant to sit on the grass behind the sidewalk, and the defendant complied.

Once the defendant was seated on the grass, the detective conducted a protective search of the passenger area of the

4

truck.  The detective testified that during the protective search, he saw a small corner-cut piece of a plastic baggie on the passenger seat.[2]  He further testified that, in his experience, corner cuts can be used to package drugs.  The body-worn camera footage also shows that the detective found a cell phone in the passenger door pocket, which he manipulated in a way that illuminated the screen and allowed him to see if there were any notifications.  The detective placed the cell phone back in the door pocket shortly after.

Following the protective search, the detective returned to his cruiser to run the defendant's information through his computer.  He testified that the inquiry revealed the defendant had multiple open cases and had served time for possession with intent to distribute fentanyl, oxycodone, and "crack" cocaine.

Upon learning this information, the detective walked back to where the defendant was seated on the grass and issued the defendant Miranda warnings.  The defendant confirmed that he understood his rights.  At this point, the detective told the defendant that he believed the defendant was hiding drugs on his

---

[2] As the Commonwealth correctly concedes, the body-worn camera footage does not show the corner-cut baggie. Nonetheless, the motion judge credited the detective's testimony regarding the baggie corner, and the defendant does not challenge that finding as clearly erroneous.  See Arias, 497 Mass. at 429.

person.  The detective explained that he had a dog with him who was trained to detect narcotics and that he intended to run the dog by the defendant.  He advised the defendant that if the dog alerted to anything on the defendant, they will "deal with it." Alternatively, the detective told the defendant that if the defendant wanted to be forthcoming and hand over any drugs he had on his person, and if "it [was] not a kilo," the detective would release the defendant and summons him to court.  The defendant agreed to "give up" the drugs to the detective.

The defendant reached into the rear of his pants and produced a clear plastic baggie, which contained several plastic baggies of white-colored substances.[3]  The detective took the baggie from the defendant and seized $1,240 in currency from the defendant's pockets.

The detective subsequently released the defendant, and the defendant was issued a summons to appear in the District Court. The detective testified that throughout the encounter, which lasted about forty-five minutes, the defendant was "extremely polite and cooperative."

Discussion.  "A routine traffic stop may not last longer than 'reasonably necessary to effectuate the purpose of the

---

[3] The detective testified that the defendant identified the substances as "Down and hard," which "on the streets" refer to fentanyl and crack cocaine.

6

stop.'" Commonwealth v. Cordero, 477 Mass. 237, 241 (2017), quoting Commonwealth v. Amado, 474 Mass. 147, 151 (2016). "The scope of a stop may only extend beyond its initial purpose if the officer is confronted with facts giving rise to a reasonable suspicion that further criminal conduct is afoot" (quotation and citation omitted). Commonwealth v. Tavares, 482 Mass. 694, 703 (2019). Otherwise, "[p]olice authority to seize an individual ends 'when tasks tied to the traffic infraction are -- or reasonably should have been -- completed.'" Commonwealth v. Soriano-Lara, 99 Mass. App. Ct. 525, 528 (2021), quoting Cordero, supra at 242.

For the purposes of our analysis, we assume without deciding that the detective was justified in (1) issuing the exit order, (2) conducting the patfrisk of the defendant, and (3) carrying out the protective search of the front passenger area of the truck.[4] But any reasonable suspicion the detective may have had or any concern for officer safety dissipated after the patfrisk and protective search. Neither search revealed weapons or contraband on the defendant's person or in the

---

[4] We need not decide whether the detective was justified in manipulating the cell phone to view potential notifications while he was searching the passenger area for weapons. See Riley v. California, 573 U.S. 373, 401 (2014) ("a warrant is generally required before [a search of a cell phone]"). See also Commonwealth v. Sheridan, 470 Mass. 752, 763 (2015) (same).

7

passenger area of the truck, and the defendant was no longer nervous.  See Commonwealth v. Douglas, 472 Mass. 439, 443 (2015) (any reasonable suspicion regarding rear passengers "dissipated when no weapon was found on either individual" after exit order and patfrisk).[5]

At this point in the encounter, the defendant was handcuffed and seated on the grass, and there was no reason for the detective to prolong the interaction.  The detective needed probable cause to search the defendant's person.  See Commonwealth v. Villagran, 477 Mass. 711, 717 (2017) (patfrisk must be justified by reasonable suspicion that defendant was armed and dangerous, whereas subsequent search of backpack "must be justified by probable cause and an exception to the warrant requirement").  See also Commonwealth v. Leslie, 477 Mass. 48, 58 n.13 (2017) ("Our laws do not recognize an exception to the warrant requirement based solely on reasonable suspicion . . .").  But the detective's observation of the corner-cut of a

---

[5] In Douglas, the Supreme Judicial Court determined that there was still reasonable suspicion justifying the subsequent protective sweep of the vehicle because the front-seat passenger got out of the vehicle unprompted, expressed displeasure with the officer, and shifted the vehicle's transmission into "drive" after he returned to his seat.  Douglas, 472 Mass. at 446. Those actions, "combined with the occupants' activities earlier that evening, and the officers' knowledge, were sufficient to support a reasonable suspicion that [the front-seat passenger] either had a weapon on his person or that there was a weapon in the vehicle."  Id. at 446-447.

plastic bag on the passenger seat of the vehicle and the fact that the defendant had an unknown amount of currency in his pockets[6] did not amount to probable cause to believe any criminal activity was afoot, as the Commonwealth concedes.  See Commonwealth v. Garcia, 34 Mass. App. Ct. 645, 650 (1993) ("trooper did not observe anything in the automobile or in the conduct of the occupants of the vehicle which, in conjunction with his observation of the [transparent glassine] baggie, would have supplied probable cause" to search [emphasis added]). Without probable cause, the detective was required to end his inquiry of the defendant and complete the traffic stop.  See Tavares, 482 Mass. at 703; Soriano-Lara, 99 Mass. App. Ct. at 528.  The detective was not permitted at that point to prolong the interaction by returning to his cruiser to check the defendant's record and then giving the defendant the choice to hand over any drugs on his person or have the detective bring a

---

[6] The detective was not permitted to remove the currency from the defendant's pockets.  See Commonwealth v. Amado, 474 Mass. 147, 153 (2016) ("under the 'plain feel' doctrine, an officer may seize contraband discovered during a Terry-type frisk if the officer feels an object whose contour or mass makes its identity immediately known" [emphasis added]).  Thus, we do not consider the amount of currency the defendant had on his person in our analysis.  The most that might be considered would be the defendant's statement that he had $500 in his pocket, which would not materially contribute to the justification for prolonging the stop.

canine to sniff the defendant.  Therefore, all physical evidence obtained after that point must be suppressed.

Order denying motion to
  suppress reversed.

By the Court (Henry, Sacks &
  Tan, JJ.[7]),

Clerk

Entered:  July 23, 2026.

---

[7] The panelists are listed in order of seniority.